# CIRCUIT COURT FOR BALTIMORE COUNTY

IN EQUITY.

Filed March 3, 1891.

### THE PRESBYTERIAN CHURCH OF CANTON ET AL.
### VS.
### THE WELSH CONGREGATIONAL CHURCH OF BALTIMORE COUNTY ET AL.

*Cowen & Cross* and *J. I. Yellott* for plaintiffs.

*Henry Stockbridge, J. T. Ensor* and *J. S. Ensor* for defendants.

BURKE, J.—

The bill in this case was filed in March, 1890. The prayer for relief is, First, That the defendants may be enjoined by preliminary injunction until final hearing from interfering with the plaintiffs' possession and use of the church premises mentioned in the bill, as a place of divine worship. Second, That the defendants may be restrained from interfering with the possession of the plaintiffs of said premises and the use and occupation of the same as the property of the said Canton Presbyterian Church.

Third, That George Williams and David Hopkins surviving Trustees in a certain deed from the Canton Company (a certified copy of which deed is filed with the bill) may be decreed to the Presbyterian Church of Canton. A preliminary injunction was issued as prayed. The defendants have answered, issues have been made up, testimony taken and the case has been fully and ably argued by the respective counsel, and is now to be determined by the Court upon the bill, answer and testimony. The case presents some important and interesting questions re-

specting the law of Church property. I have carefully considered the evidence, exhibits and arguments of counsel, and have examined all the authorities at my command bearing upon the questions involved, and whilst the case is susceptible of very elaborate and interesting discussion, I do not propose to do more than to state briefly the controlling facts, clearly established by the evidence, and apply the principles of law, which in my judgment, should govern the case.

The facts necessary to be stated, and which are satisfactorily established by the evidence, are these: About the year 1863 there existed at Canton, Baltimore County, a body or society of Christian people, mostly of Welsh birth or descent, known as Congregationalists, who met for divine worship in the public school house at that place. The number of the members of this congregation at that time does not appear from the testimony. They determined to erect a house of worship, and on the 4th day of August, 1866, the corner stone of the edifice now in controversy was laid. It was first proposed to locate the church on Clinton street, but the location was afterwards made on Tome street, for reasons explained in the evidence. The church was erected by voluntary contributions of money and labor. The sacrifices made and the earnestness and disinterestedness displayed in the building of this church cannot fail to excite the greatest admiration and respect for those engaged in the work, and furnish indisputable evidence of their religious zeal and piety. Divine service was held in the church before it was fully completed, and after its completion the congregation was regularly organized and was known as The Bethlehem Green Welsh Independent Congregational Church. The church or congregation adopted and adhered to the strictly Congregational or independent form of church government, and owed no submission to any organization outside the congregation. The Canton Company, which owned the ground upon which the church was built, had signified a readiness to convey the same to the congregation. Thereupon, at a congregational meeting, the following named persons were elected trustees, to whom the ground might be conveyed, viz: John Jenkins, Henry Charles, Thomas James, George Williams and David Hopkins, and accordingly on the 4th day of October, 1867, the Canton Company executed and delivered to said trustees a deed of the property.

A certified copy of this deed is filed among the proceedings in this cause, and it contains the following declaration of the uses and purposes to which the land conveyed should be devoted. The deed is made by the Canton Company to the above named trustees of the Bethlehem Green Welsh Independent Church of Canton in said county of Baltimore," and after describing the land granted, declares:

"And the said John Jenkins, Henry Charles, Thomas James, George Williams and David Hopkins, trustees as aforesaid, for themselves, their heirs, executors, administrators and assigns and for all who may by any means succeed them in the trust aforesaid, do hereby covenant grant and agree to and with the said Canton Company of Baltimore, its successors and assigns, that the lot of ground hereinbefore conveyed and the building thereon erected shall at all times be and continue to be devoted to and used for divine worship and sabbath school purposes and should the use thereof be discontinued for the space of six months successively, then and in such case the said above described lot, together with all the improvements thereon, shall revert to and be reinvested in said Canton Company of Baltimore, its successors and assigns, and all interest thereon created by the conveyance aforesaid shall cease and be void."

After the completion of the church, and the organization of the congregation and the execution and delivery of the deed, the congregation in 1868 secured the services of a Mr. Richards as pastor. The copper works at Canton in which most of the male members of the church were employed, suspended work in 1872, the members thus being thrown out of employment, and having no means to support their pastor, he severed his pastoral relations with them in that year. From that time until the advent of the Rev. Mr. Jones, the church was without a pastor; were few in numbers and in bad financial condition and was only saved from hopeless ruin and bankruptcy by the generosity of a Mr. Stickney. It was on the eve of dissolution and the contingency specified in the deed whereby the property

would have reverted to the Canton Company, was likely to occur.

2. The above is a brief history of the Bethlehem Green Welsh Independent Church of Canton, and of its condition at the opening of the communication and negotiations between George Garrett, the then clerk of the congregation, and the Rev. J. Wynne Jones in the year 1877, looking to Mr. Jones becoming the pastor of the church. Mr. Jones was a Presbyterian minister. The result of the communications, visits, interviews, etc., between Mr. Jones, Mr. Garrett and the congregation as disclosed clearly by the evidences, was that Mr. Jones should become the pastor of the church; that the Welsh Independent Church should abandon its congregational or independent form of church government; that it should unite itself to the Presbytery of Baltimore; that it should become a Presbyterian congregation and submit to the form of government and discipline of the Presbyterian Church in the United States. Accordingly in April, 1878, the congregation addressed a petition to the Presbytery of Baltimore asking to be organized into a Prebyterian Church. The extract of the official minutes of the Presbytery referring to this petition is as follows:

### A NEW CHURCH.

"The petition of certain persons residing at Canton, Maryland, as presented, requesting the Presbytery to take the proper steps to organize them as a Presbyterian Church of this Presbytery, in which character the request was granted, and a committee was appointed, consisting of the Rev. Henry Matthews, Geo. E. Jones and Elder J. F. Moore, to organize the proposed church, if the way be clear."

The next entry upon the official minutes of the Presbytery is under date of April 11, 1878, and relates to the report of the above committee. It is as follows:

"The committee appointed to organize a church at Canton, reported through the Rev. Henry Matthews, that they had organized a church at Canton, consisting of twenty-eight members, and that the following named persons had been ordained ruling elders: George Williams and George Garrett. The committee recommended that the church be taken under the care of the Prebytery, and enrolled, as "The Presbyterian Church of Canton."

This report was adopted and the church was enrolled and recommended to the Board of Home missions for an appropriation of $400 per annum. An entry on the official minutes of the Prebytery of Baltimore under date of June 11, 1878, is as follows:

"Rev. J. Wynne Jones, of the Presbytery of Monmouth, presented a letter of dismission from that body to unite with the Prebytery, which, being found in order he was, after the usual examination, received as a member, and his name was accordingly enrolled. The church at Canton laid before the Presbytery a call for the pastoral services of Rev. Mr. Jones. The call was found in order, and was placed in the hands of Mr. Jones, who declared his acceptance of it. Arrangements were made for the installation of Mr. Jones on Thursday evening, June 20th inst., as follows:—Rev. A. B. Cross to preside and propose the constitutional questions, Rev. T. T. Noyes to preach the sermon; Rev. George E. Jones to deliver the charge to the pastor and the Rev. Mr. Holmes of the Congregational Church of this city was invited to deliver the charge to the people." I think it is established beyond all controversy by the evidence that the original Bethlehem Green Welsh Independent Church at a congregational meeting by the unanimous consent of the members and of the then trustees, decided to join the Presbyterian Church that they were regularly organized as a Presbyterian Church, according to the form of government of the Presbyterian Church; were united with and taken into connection with the Presbytery of Baltimore and submitted themselves to the ecclesiastical jurisdiction and discipline of the Presbyterian Church; that the Rev. J. Wynne Jones was regularly called and duly installed as the Presbyterian Pastor of the said Presbyterian Church and congregation into which the original Welsh Independent Church of Canton by unanimous action of its members, taken at a congregational meeting called for that purpose, and by the action of the proper church authority of the Presbyterian Church had become merged; and that this Church with Mr. Jones as its pastor continued in uninterrupted and exclusive possession of the church property in controversy, located in Tome street from April, 1878, until the 31st day of December, 1889; and that from the day of its organization to the present it has

156

been in connection with the Presbytery of Baltimore; borne upon its roll of membership of churches and under its protection.

"The Presbyterian Church in the United States" is a voluntary organization, which has been in existence for nearly a century. It has a written confession of faith, form of government book of discipline and directory for worship. The government of the church is exercised by an through an ascending series of "Judicatories" known as church sessions, presbyteries, synods and a general assembly. The church sessions consisting of the pastor and ruling elders of a particular congregation is charged with maintaining the spiritual government of the congregation, for which purpose they have various powers, among which is the power to receive members into the church, *and to concert the best manner for promoting the spiritual interests of the congregation.* See Form of Government, ch. 9, Secs. 1 and 6. This body which thus controls in each *local church* is composed of the pastor and ruling elders. The number of the elders is variable and a majority of the session governs. It acts however, but as representing the congregation which elects it. The elders so far as the church edifice is concerned have no power to dispose of its use except as members of the session. The Presbytery, consisting of all the ministers and one ruling elder from each congregation within a certain district, has various powers, *among them the power to visit particular churches for the purpose of enquiring into their state and redressing the evils which may have arisen in them; to ordain and install, remove and judge ministers; and in general, power to order whatever pertains to the spiritual welfare of the churches under their care.* See Form of Government, ch. 10, Sec. 8. The synod consisting of all the ministers and one ruling elder from each congregation in a larger district, has various powers, among them the power to receive and issue appeals from presbytery; to decide on all references made to them; to redress whatever has been done by presbyteries contrary to order, and generally to take such order with respect to the presbyteries, sessions and people, under their care as may be in conformity with the Word of God and the established rules and which tend

to promote the edification of the church. See Form of Government, ch. 11, secs. 1 and 4.

The General Assembly, consisting of ministers and elders commissioned from each Presbytery, under its care, in the highest judicatory of the Presbyterian Church, representing in one body all the particular churches of the denomination. Besides the power of receiving and issuing appeals and references from inferior judicatories, to review the records of Synods and to give them advice and instruction in all cases submitted to them in conformity with the constitution of the church, it is declared that it "shall constitute the bond of union, peace, correspondence and mutual confidence among our churches." To the General Assembly also belongs the power of deciding in all controversies respecting doctrine and discipline; of reproving, warning and hearing testimony against any error in doctrine, or immorality in practice in any church. Presbytery or Synod; of superintending the concerns of the whole church; of suppressing schismatical contentions and disputations; and in general of recommending and attempting reformation of manners and the promotion of charity, truth and holiness through all the churches under their care.

At the time of the call and installation of Mr. Jones, in 1878, as pastor of the new Presbyterian Church thus organized and formed from the old Welsh Independent Church, all the original trustees were alive, except John Jenkins. And the ruling elder and trustees, by the unanimous vote of the congregation, were instructed to sign the call for Mr. Jones' pastoral services. John P. Williams had been substituted in place of John Jenkins, but exactly when and how he had been elected or appointed does not very clearly appear. The persons now claiming and holding the church property for the benefit of what is known as 'The Welsh Congregational Church of Baltimore County" are Geo. Williams, John P. Williams, William Griffith, Griffith Thomas and Stephen E. Nunn. Two of these persons, viz: George Williams and John P. Williams were trustees at the time of the installation of Mr. Jones and signed his call under the instruction of the congregation, and one of whom, to wit, George Williams, was at the time a ruling elder of the church and signed the call as such. George Garrett was also

at that time a ruling elder, and subsequently John P. Williams was elected as such. It thus appears that two of the principal witnesses for the defence, namely, George Garrett and John P. Williams were connected with the Bethlehem Green Welsh Independent Congregation at the time it determined to organize itself into a Presbyterian Church, and both of whom after such organization, were ruling elders in said church.

Two of the remaining trustees, viz: Griffith Thomas and Stephen E. Nunn, never were members of the Presbyterian Church, and Wm. Griffith, the other trustee, had long before this joined the Methodist Church. The affairs of the church, after the beginning of the pastoral work of Mr. Jones, ran along smoothly for some time. Finally trouble and disputes arose between himself and John P. Williams, George Garrett and Wm. Griffith, which resulted in these and other members leaving the church. After the erection of the Abbott Memorial Church at Highlandtown and the appointment of Mr. Jones as its pastor, he was charged with neglecting the interests of the Toome Street Church, and with a deliberate purpose to sacrifice it in the interest of the Abbott Memorial Church. It is contended that instead of seeking the prosperity and growth of the Toome Street Church, which he had solemnly obligated himself to serve and extend, he treacherously endeavored to destroy it. The results of this contention and discord in the church was, that a number of persons who had formerly belonged to the Welsh Church and afterwards to the Presbyterian Church, feeling that Mr. Jones had not discharged his obligations as pastor, and was using his influence to draw away the members of the Toome Street Church to the Abbott Memorial Church, withdrew from the church and met for divine worship occasionally at private houses in the vicinity; and in the spring or summer of 1889 it was determined to assert a claim which they thought they had, as representing the old Bethlehem Green Welsh Independent Church, to the possession of the church property, and if possible, regain possession and control of the same. At that time only three of the board of trustees who had joined in the call to Mr. Jones to become pastor and who had in 1878 united with the Presbyterian Church, were

alive, viz: David Hopkins, George Williams and John P. Williams. These trustees held a meeting on the 6th day of May, 1889, *at the house of George Williams*. At this meeting these three elected Wm. Griffith and Griffith Thomas trustees in the stead of Henry Charles and Thomas James, who had died.

To quote from the minutes of the meeting, they were elected as members of "the board as trustees of the Welsh Independent Congregational Church at Canton." On the 7th of May, 1889, another meeting was *held at Mr. Williams's house*. It appears from the minutes of this meeting that Mr. Griffith and Mr. Thomas who had been elected at the meeting held the night previous, were present. In the words of the minutes of the meeting, Mr. Hopkins, who was chairman, "ask Mr. William Griffith and Mr. Griffith Thomas if they would 'except' to serve as members of the board of trustees of the Welsh Independent Congregation Church. Mr. Griffith and Mr. Thomas was willing to serve and was willing to do all in their power to help the old Welsh Church up once more, hoping some day that the old Welsh Church would shine like a star." At this meeting Mr. David Hopkins filed *a written resignation as a trustee of the Tome Street Presbyterian Church*, was objected that he was not a trustee of the *Presbyterian Church*, but the Welsh Independent Church, thereupon, in the words of the minutes. "So Mr. David Hopkins resigned as a member of the Welsh Independent Congregation Church, it was moved by Mr. William Griffith that Mr. Hopkins' resignation would be accepted, it was seconded by Mr. John P. Williams, and declared by the chair," but this resignation of David Hopkins, one of the original trustees under the deed from the Canton Company, of his trusteeship under said deed was *a mere verbal resignation*, and the said Hopkins is now one of the plaintiffs in this suit. The next meeting of the board of trustees was held *at the house of John P. Williams* on the 21st of May, 1889.

At this meeting it was determined to transact no business until a new member had been elected in the place of Mr. Hopkins who was considered as having resigned. At a meeting held on the 17th of June, 1889, *at the house of John P. Williams*, Mr. Stephen E. Nunn was elected in the place of Mr. Hop-

kins. Having thus secured a full board of trustees, the minutes of this meeting recite that a motion was made by Mr. John P. Williams and seconded by Geo. Williams, "Resolved that all the church property, that is to say the church and everything that it contain, all the books and library that belong to the Welsh congregation at Canton to be under the control of the original trustees and that the *secretary* should "right" and notify Mr. Jones and the superintendent of the Sunday School to vacate by August 1st." It will be observed of these two meetings *held at the church*, that of July 2, 1889, was on Tuesday and that of July 20, 1889, on Saturday, days when according to the evidence the Presbyterian congregation was not accustomed to meet at the church. It is admitted in the testimony of Griffith Thomas that the whole matter about doing repairs upon the church by the trustees was a subterfuge, in order to enable them to get possession of the church property and that once in possession they intended to maintain it against the Presbyterian Church. In pursuance of this resolution of the 20th of July, 1889, the president of the board of trustees and William Griffith the secretary, addressed the letter of the 20th of July (filed in the cause) to Mr. Jones, the pastor, and Evan Jones, the superintendent of the Sunday School, notifying them to vacate the church premises by August 1, 1889. Thereupon Mr. Jones laid these letters and the whole matter of the dispute in the Toome street church before the Presbytery of Baltimore; consulted counsel, notified the trustees that he would resist all attempts on their part to take possession of the property, and that he would assert his own rights and the rights of the Presbyterian congregation to the use and possession of the property, and in order to retain the possession of the church for the use of the congregation and to prevent the trustees from excluding himself and the congregation he placed a new lock on the front door and took charge of the key. He continued to hold religious services in the church every Sunday, though they do not appear to have been very well attended.

Things remained in this condition until the afternoon of the 31st day of December, 1889, at which time Griffith Thomas, one of the trustees in behalf of the board of trustees entered the

church by one of the windows; changed the lock and took possession of the church. Prior to this taking possession, these trustees had on the tenth day of October, 1889, secured the certificate of incorporation filed in this case of "the Welsh Congregation Church of Baltimore County," and had on the second day of October, 1889, obtained a deed from George Williams, one of the surviving trustees named in the deed from the Canton Company to himself, Jenkins and others. By this deed he professes to grant unto the said Welsh Congregational Church of Baltimore County, all the land described in the deed from the Canton Company to John Jenkins, Henry Charles, Thomas James, George Williams and David Hopkins. This deed recites that David Hopkins, one of the plaintiffs in this suit and the other surviving trustee had resigned his trusteeship, though his resignation, as before stated, was *merely verbal*. These five trustees, elected as above stated, are also named as trustees of "the Welsh Congregational Church of Baltimore County." Having taken possession of said church on the 31st day of December, 1889, they have retained the same until the present time and have excluded the Presbyterian congregation and its pastor, Rev. J. Wynne Jones from the use and enjoyment of the church premises. *This possession and exclusion was taken and done by the said trustees without the knowledge or action of the Tome street Presbyterian congregation and without the knowledge or action of the Presbytery of Baltimore Synod, or General Assembly of the Presbyterian Church, and so far as the evidence discloses, without the knowledge or action of any other congregation in regular meeting.*

After the trustees had taken possession they began to hold religious services in the church, using the minute book of the former Presbyterian congregation as a record book for church work, etc.; they secured the services of Mr. Berdencoff as pastor, and on the 14th day of September, 1890, long after the bringing of this suit, they organized a Congregational Church, with a membership of 12 persons, six of whom had formerly been members of the Presbyterian Church. It is claimed that these religious services were well attended, and that if this litigation should be determined in favor of the defendants,

the congregation will soon be in a flourishing condition. It also appears that the Presbyterian congregation, at the time of its exclusion from the church property, consisted of 20 members, whose names are given in the evidence. "The Presbyterian Church of Canton," one of the plaintiffs, was incorporated on the 10th day of January, 1890, and that a majority of the trustees named in said incorporation were members of the Presbyterian congregation at Canton at the time Thomas and others took possession on the 31st of December, 1889.

Such being the main and controlling facts fairly established by the evidence, the inquiry arises: What are the principles of law which should control the case? Clearly the original trustees under the deed from the Canton Company held the property in question upon a simple trust for the benefit of the then Bethlehem Green Welsh Independent Church of Canton; between them and the congregation the relation of trustee and *cestui que trust* was established. The legal title was by the deed vested in the trustees, but the members of the congregation were the real and substantial owners of the property. This congregation had no ecclesiastical of any sort with any other religious organization, but was strictly congregational and independent.

It was a law unto itself, and was governed solely within itself. Under Art. 36 of the Declaration of Rights, which declares, "That as it is the duty of every man to worship God in such manner as he thinks most acceptable to him, all persons are equally entitled to protection in their religious liberty," it had a clear right in law to change its government, faith, form of worship, discipline and ecclesiastical position. This provision is as applicable to congregations as it is to individuals, for neither are free unless this legal right may be enjoyed." The American people came to the work of framing their fundamental laws after centuries of religious oppression and persecution, sometimes by one party, or sect, and sometimes by another, had taught them utter futility of all attempts to propagate religious opinions by the rewards, penalties or terrors of human laws. They could not fail to perceive, also, that a union of church and State, like which existed in England, if not wholly impracticable in America, was certain-

ly opposed to the spirit of our institutions, and that any domineering of one sect over another as repressing to the energies of the people, and must necessarily tend to discontent and disorder. Whatever, therefore, may have been their individual sentiments upon religious questions, or upon the property of the State assuming supervision and control of religious affairs under other circumstances, the general voice has been, that persons of every religious persuasion should be made equal before the law, and that questions of religious belief and religious worship should be questions between each individual man and his Maker, of which human tribunals are not to take cognizance so long as the public order is not disturbed, except as the individual by his voluntary action in associating himself with a religious organization may have conferred upon such organization a jurisdiction over him in ecclesiastical matters." Cooley's Cons. Lim. Ch. 13, p. 467.

"In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows heresy, is committed to the support of no dogma, the establishment of no sect. The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association and for the ecclesiastical government of all the individual members, congregations and officers within the general association is unquestioned. Watson vs. Jones, 13 Wallace, p. 728; Keyser vs. Stansifer, 6 Ohio, p. 363; Robertson vs. Bullious, 11 N. Y., p. 249; Parish of Bellport vs. Tooker, 29 Barb., p. 256; McGinnis et al. vs. Watson, 5 Wright, p. 6.

The Bethlehem Green Welsh Independent Church of Canton having the undoubted legal right to make the change from congressional or independent church to a Presbyterian congregation and to unite itself to the Presbytery of Baltimore, and submit to the form of government and discipline of the Presbyterian Church, and having in fact made this change formed this ecclesiastical connection, and accepted

this government by the unanimous and solemn act of the congregation at a meeting called to decide that question, the next inquiry to be determined is: What rights did this duly formed Presbyterian congregation acquire in the church property? The solution of this question depends, in my judgment, upon *the nature of the trust* created in the deed from the Canton Company to John Jenkins and others, trustees. I am of opinion that by the terms of this deed the property in question was dedicated to what may be termed, *a general pious or charitable use,* and fall clearly within the second class of cases considered in Watson vs. Jones, 13 Wallace, pp. 724-725.

The Presbyterian congregation worshiping in Tome street church, Canton, from the time of its organization in 1878 by the committee of the Presbytery of Baltimore with Mr. Jones as its pastor, is the legal successor of the old Welsh Congregational Church, and was at the time of its exclusion entitled to the use and enjoyment of the church property. The original congregation by its unanimous action became a Presbyterian Church, and the legal effect of such action was to place itself and the church property under the authority of the third canon declared by the Court in Watson's case, pp. 722, 726, etc. It does not appear that the *Presbyterian congregation,* of which Mr. Jones is pastor has made any complaints, or preferred charges against him either to the church sessions, Presbytery of Baltimore, synod or general assembly; nor does it appear that any action has ever been taken by the Presbyterian congregation to dissolve its connection with the Presbyterian Church; nor that a majority of the congregation are dissatisfied with Mr. Jones as pastor. *Only six* of the present congregation known as "The Welsh Congregational Church, of Canton, Baltimore County," were members of the Presbyterian Church at the time of its dispossession from the church premises; that the action of the trustees was illegal and unwarrantable under the circumstances, reference made to the cases of Morgan vs. Rose, 7C E Green, N. J., pp. 583, 590; Whitcar vs. Michenor, 37 N. J. Equity, pp. 6 to 14; Worrell vs. First Presbyterian Church, 23 N. J. Eq. 96; Sheldon vs. Congregational Parish, 24 Pick 286;

Henry vs. Deitrich et al., 84 Penn State, 286, 292.

The principles of these cases seem to be singularly opposite to the facts of this case. In the view I have taken of the case, much of the evidence is irrelevant, and with the criticism upon the conduct, manners and ministration of Mr. Jones, the Court has nothing to do. Mr. Jones and the congregation were under the control of the Prebytery of Baltimore and subject to its jurisdiction. It had full power to judge or remove him, if he failed to perform his duties, or if his pastorate had become injurious to the church. It had the power, under the form of government, *"to particular churches for the purposes of inquiring into their state and redressing the evils which may have arisen in them; to remove and judge ministers, and in general power to order whatever pertains to the spiritual welfare of the church* under their care." Anyone feeling himself aggrieved by the action of the church session may appeal to the Presbytery: from that body to the Synod and from the Synod to the highest tribunal in the church, namely the General Assembly. The differences in this church between the pastor and some of the members belong exclusively to the proper church tribunals and should be settled by them. "The Welsh Congregational church of Baltimore County," one of the defendants, is not a valid corporation the provisions of the Statute law of the State, authorizing the incorporation of religious societies, not having been complied with 1st Vol. Code Pub. Gen. Laws, Art. 23, Sec. 211. Boyce vs. Trustees of M. E. church, 46 Md. p. 372; as to the agreement by the trustees to convey the church property to the Presbyterian body; this was discussed before Mr. Jones became Pastor and he has testified that the agreement was made and was one of the conditions upon which he consented to come as pastor, and it appears by the testimony of John P. Williams that a majority of the trustees, including Geo. Williams and David Hopkins, the only surviving trustees named in the deed from the Canton Company, agreed to make the transfer. See evidence of John P. Williams, p. 133.

But whether or not this agreement was *in fact* made does not, in my opinion, control the case. The trust created in the deed from the Canton Com-

pany to John Jenkins and others being one for *general pious* or *charitable uses,* the *legal result* of the change from a congregational or independent congregation to a Presbyterian Church was to constitute the newly formed Presbyterian congregation the lawful successor of the original Bethlehem Green Church, and as such successor entitled to the property, and that as a *matter of law* the trust created under the deed from the Canton Company is now a trust for the use and benefit of the Presbyterian congregation." The Presbyterian Church of Canton, one of the plaintiffs, was properly incorporated upon the action of competent members of the Presbyterian congregation of Tome street, Canton, and by sec. 216, art. 23, Code of Public General Laws, is entitled to have the legal title vested in it for the use and benefit of said congregation. I therefore conclude:

1. That the preliminary injunction heretofore issued should be made perpetual.

2. That a decree should be passed declaring a trust in the church property mentioned in the bill of complaint in the Presbyterian congregation of Canton, and that the title to said property is held for its use and benefit, and decreeing that the present trustees holding said property shall grant and convey the same to "The Presbyterian Church of Canton," a body corporate, and, if necessary, appointing a trustee to make said conveyance. I will sign a decree in accordance with this opinion.